1  Michael B & Sharon J Sparlin
2  7922 South Clarkson Court
3  Tucson  AZ  85706

4  UNITED STATES DISTRICT COURT
5  DISTRICT OF ARIZONA

**Michael B & Sharon J Sparlin**

Plaintiff,

vs.

**Bank of America Home Loans**

Defendant

Case # _____

CIV10- 507 TUC FRZ

ORIGINAL PETITION

6

7                                    Date: 8/19/10

8  Comes now  Michael B & Sharon J Sparlin , hereinafter referred to as "Petitioner," and moves
9  the court for relief as herein requested:

10                              **PARTIES**

11  Petitioner is  Michael B & Sharon J Sparlin , 7922 South Clarkson Court  Tucson  AZ 85706.
12  Currently Known Defendant(s) are/is:  Bank of America Home Loans , 9700 Bissonnet Street,
13  Suite 1500 , TX  77036, by and through its attorney.

14                        **STATEMENT OF CAUSE**

15  Petitioner, entered into a consumer contract for the purchase of new construction property,
16  recorded on January 8, 2007, Docket 12966, Page 3332, Sequence 20070050717, APN 141-09-
17  2140,  located at  7922 South Clarkson Court  Tucson  AZ 85706, hereinafter referred to as the
18  "property."

19
20  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a
21  predatory loan agreement with Defendant.

22  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully
23  crafted scheme intended to defraud Petitioner.

ORIGINAL PETITION

24   Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
25   of the types of tactics used by Defendants to defraud Petitioner.

26   Defendants charged false fees to Petitioner at settlement.

27   Defendants used the above referenced false fees to compensate agents of Petitioner in order to
28   induce said agents to breach their fiduciary duty to Petitioner.

29   Defendant's attorney caused to be initiated collection procedures, knowing said collection
30   procedures in the instant action were frivolous as lender is estopped from collection procedures,
31   under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
32   the production of the original promissory note alleged to create a debt.

### IN BRIEF
*(Non-factual Statement of Posture and Position)*

35   It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
36   making a number of allegations that, outside the context of the current condition of the real
37   estate industry, may seem somewhat outrageous and counter-intuitive.

38   When Petitioner accuses ordinary individuals of acting in concert and collusion with an
39   ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
40   unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
41   people, just doing what they have been trained to do, are out to swindle the poor
42   unsuspecting borrower.

43   The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
44   committed by people acting in concert and collusion, one with the other.  Petitioner has no
45   reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
46   that what they were doing was part of an ongoing criminal conspiracy, only that it was,
47   and they, at the very least, kept themselves negligently uninformed of the wrongs they
48   were perpetrating.  Petitioner maintains the real culprit is the system itself, including the
49   courts, for failure to strictly enforce the consumer protection laws.

### CAREFULLY CRAFTED CRIMINAL CONNIVANCE
*(General State of the Real Estate Industry)*

ORIGINAL PETITION

52    ***THE BEST OF INTENTIONS***

53    Prior to the 1980's and 1990's ample government protections were in place to protect
54    consumers and the lending industry from precisely the disaster we now experience.
55    During President Clinton's administration, under the guise of making housing available to
56    the poor, primary protections were relaxed which had the effect of releasing the
57    unscrupulous on the unwary.

58    Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
59    the risk.  Consequently, Americans were engaged in safe and stable home mortgages.
60    With the protections removed, the unscrupulous lenders swooped in and, instead of
61    making loans available to the poor, used the opportunity to convince the unsophisticated
62    American public to do something that had been traditionally taboo; home buyers were
63    convinced to speculate with their homes, their most important investment.

64    Bank of America Home Loans , Ameriquest, Countrywide, and many others swooped in
65    and convinced Americans to sell their homes, get out of their safe mortgage agreements,
66    and speculate with the equity they had gained by purchasing homes they could not afford.
67    Lenders created loans intended to fail as, under the newly crafted system, the Lender
68    profited more from a mortgage default than from a stable loan.

69    Companies cropped up who called themselves banks when, in fact, they were only either
70    subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
71    creating and selling promissory notes.  As will be demonstrated, these companies then
72    profited from the failure of the underlying loans.

73    ***HOW IT WORKS***

74    Briefly, how it works is this, the Lender would secure a large loan from a large bank,
75    convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
76    investor.

77    People would set up mortgage companies buy securing a large loan from one of the major
78    banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this
79    an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
80    lender who would secure the title from the seller using the borrowed bank funds for that
81    purpose, and then trade the title to the buyer in exchange for a promissory note.

ORIGINAL PETITION

82   The lender then <u>creates a</u> 20 or 30 year mortgage with money the lender must repay within
83   6 months.  As soon as the closing is consummated, the promissory note is sold to an
84   investor pool.

85   Using the instant case as an example, a 177,700.00 note at 8.6623% interest over 30 years
86   will produce $154,955.42  The lender can then offer <u>to the investor</u> the security instrument
87   (promissory note) at say 50% of it's future value.  The investor will, over the life of the
88   note, less approximately 3.00% servicing fees, realize $245,681.26 .  The lender can then
89   pay back the bank and retain a handsome profit in the amount of $83,178.04.  The lender,
90   however, is not done with the deal.

91   The lender signed over the promissory note to the investor at the time of the trade, <u>but did</u>
92   not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme
93   Court addressed this issue and stated that such a transaction was certainly legal.  However,
94   it created a fatal flaw as the holder of the lien document, at time of sale of the security
95   instrument, received consideration in excess of the lien amount.  Since the lien holder
96   received consideration, he could not be harmed.  Therefore the lien became an
97   unenforceable document.

98   This begs <u>the</u> question: if keeping the lien would render it void, why would the lender not
99   simply transfer the lien with the promissory note?  The <u>reason is because the</u> lender will
100   hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
101   amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
102   liability.  The lender, by this maneuver, gets consideration a second time.  And still the
103   lender is not done profiting from the deal.

104   After sale of the promissory note, the lender remains as the servicer for the investor.  The
105   lender will receive 3% of each payment the lender collects and renders to the investor
106   pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep
107   that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the
108   foreclosure.

109   The lender stands to profit more from a note that is overly expensive, than from a good
110   stable loan.   And where, you may ask, does all this profit come from?  It comes from the
111   equity the borrower had built up in the home.  And still the lender is not finished profiting
112   from the deal.

ORIGINAL PETITION

113    Another nail was driven in the American financial coffin when on the last day Congress
114    was in session in 2000 when restrictions that had been in place since the economic
115    collapse of 1907 were removed.  Until 1907  investors were allowed to bet on stocks
116    without actually buying them.  This unbridled speculation led directly to an economic
117    collapse.  As a result the legislature banned the practice, until the year 2000.  In 2000 the
118    unscrupulous lenders got their way on the last day of the congressional session.  Congress
119    removed the restriction banning derivatives and again allowed the practice, this time
120    taking only 8 years to crash the stock market.  This practice allowed the lender to profit
121    further from the loan by betting on the failure of the security instrument he had just sold to
122    the unwary investor, thus furthering the purpose of the lender to profit from both the
123    borrower (consumer) and the investor.

124    The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
125    bailout at the expense of the taxpayer.   The unsuspecting consumer was lulled into
126    accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
127    were acting under the guise of government regulation and, therefore, the borrower had
128    reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to
129    protect the consumer from just this kind of abuse were simply being ignored.

130    The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
131    the referral of the client to the lender by a person acting as an agent for the borrower.
132    Hereinafter, the person or entity who receives any portion of the yield spread premium, or
133    a commission of any kind consequent to securing the loan agreement through from the
134    borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
135    law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
136    seeking out a lender for the borrower, would seek the best deal for his client rather than
137    who would pay him the most.  That was the intent, but not the reality.  The reality is that
138    Agents never come away from the table with less than 2% or 3% of the principal.  This is
139    accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
140    fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
141    product than the borrower qualifies for.  This will generate more profits for the lender and,
142    consequently, for the Agent.

143    It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
144    the fair market price.  This allows the lender to increase the cost of the loan product and
145    give the impression that the borrower is justified in making the purchase.

ORIGINAL PETITION

146 The lender then charges the borrower an underwriting fee in order to convince the
147 borrower that someone with knowledge has gone over the conditions of the note and
148 certified that they meet all legal criteria. The trustee, at closing, participates actively in the
149 deception of the borrower by placing undue stress on the borrower to sign the large stack
150 of paperwork without reading it. The trustee is, after all, to be trusted and has been paid to
151 insure the transaction. This trust is systematically violated for the purpose of taking unfair
152 advantage of the borrower.   The entire loan process is a carefully crafted contrive
153 connivance designed and intended to induce the unsophisticated borrower into accepting a
154 loan product that is beyond the borrowers means to repay.  With all this, it should be a
155 surprise to no one that this country is having a real estate crisis.

156 ## PETITIONER WILL PROVE THE FOLLOWING

157 Petitioner is prepared to prove, by a preponderance of evidence that:

158 · Lender has no legal standing to bring collection or foreclosure claims against the
159 property;

160 · Lender is not a real party in interest in any contract which can claim a collateral
161 interest in the property;

162 · even if Lender were to prove up a contract to which Lender had standing to enforce
163 against Petitioner, no valid lien exists which would give Lender a claim against the
164 property;

165 · even if Lender were to prove up a contract to which Lender had standing to enforce
166 against Petitioner,  said contract was fraudulent in its creation as endorsement was
167 secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
168 the inducement, fraud in the execution, usury, and breaches of contractual and
169 fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
170 Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
171 Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
172 "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
173 'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
174 bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
175 pooled together in a trust fund;

ORIGINAL PETITION

176
177
178
- Defendants have concocted a carefully crafted connivance wherein Lender conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property by inducing Plaintiff to enter into a predatory loan inflated loan product;

179
180
- Lender received unjust enrichment in the amount of 5% of each payment made late to Lender while Lender and Lender's assigns acted as servicer of the note;

181
182
183
- Lender and Lender's assigns, who acted as servicer in place of Lender, profited by handling the foreclosure process on a contract Lender designed to have a high probability of default;

184
185
- Lender intended to defraud Investor by converting the promissory note into a security instrument and selling same to Investor;

186
187
188
189
190
- Lender intended to defraud Investor and the taxpayers of the United States by withholding the lien document from the sale of the promissory note in order that Lender could then hold the lien for three years, then prepare and file Internal Revenue Form 1099a and falsely claim the full lien amount as abandoned funds and deduct same from Lender's income tax obligation;

191
192
- Lender defrauded backers of derivatives by betting on the failure of the promissory note the lender designed to default;

193
194
195
- participant Defendants, et al, in the securitization scheme described herein have devised business plans to reap millions of dollars in profits at the expense of Petitioner and others similarly situated.

196     **PETITIONER SEEKS REMEDY**
197 In addition to seeking compensatory, consequential and other damages, Petitioner seeks
198 declaratory relief as to what (if any) party, entity or individual or group thereof is the
199 owner of the promissory note executed at the time of the loan closing, and whether the
200 Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
201 Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
202 alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

203     ***PETITIONER HAS BEEN HARMED***

204 Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

ORIGINAL PETITION

205   Such harm and detriment includes economic and non-economic damages, and injuries to
206   Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

207   In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
208   equitable relief requested herein is granted.

209                                    **STATEMENT OF CLAIM**

210   *DEFENDANTS LACK STANDING*

211            **No evidence of Contractual Obligation**

212   Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
213   produce said contract.  Even if Defendants produced evidence of the existence of said contract in
214   the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
215   that a contract actually existed at one point in time.  A copy, considering the present state of
216   technology, could be easily altered.  As Lender only created one original and that original was
217   left in the custody of Lender, it was imperative that Lender protect said instrument.

218   In as much as the Lender is required to present the original on demand of Petitioner, there can be
219   no presumption of regularity when the original is not so produced.   In as much as Lender has
220   refused Petitioner's request of the chain of custody of the security instrument in question by
221   refusing to identify all current and past real parties in interest, there is no way to follow said
222   chain of custody to insure, by verified testimony, that no alterations to the original provisions in
223   the contract have been made.     Therefore, the alleged copy of the original is only hearsay
224   evidence that an original document at one time existed.  Petitioner maintains that, absent
225   production of admissible evidence of a contractual obligation on the part of Petitioner,
226   Defendants are without standing to invoke the subject matter jurisdiction of the court.

227            **No Proper Evidence of Agency**

228   Defendants claim agency to represent the principal in a contractual agreement involving
229   Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
230   pronouncement that agency has been assigned by some person, the true identity and capacity of
231   whom has not been established.  Defendants can hardly claim to be agents of a principal then
232   refuse to identify said principal.  All claims of agency are made from the mouth of the agent with
233   no attempt to provide admissible evidence from the principal.

ORIGINAL PETITION

234    Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
235    court.

236        **Special Purpose Vehicle**

237    Since the entity now claiming agency to represent the holder of the security instrument is not the
238    original lender, Petitioner has reason to believe that the promissory note, upon consummation of
239    the contract, was converted to a security and sold into a special purpose vehicle and now resides
240    in a Real Estate Mortgage Investment Conduit (REMIC)    as defined by the Internal Revenue
241    Code and as such, cannot be removed from the REMIC as such would be a prohibited
242    transaction.    If the mortgage was part of a special purpose vehicle and was removed on
243    consideration of foreclosure, the real party in interest would necessarily be the trustee of the
244    special purpose vehicle.   Nothing in the pleadings of Defendants indicates the existence of a
245    special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
246    cause to believe defendant is not the proper agent of the real party in interest.

247    *CRIMINAL CONSPIRACY AND THEFT*

248    Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
249    a criminal conspiracy to defraud Petitioner.   Said conspiracy but are not limited to acts of
250    negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
251    acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
252    Petitioner by Lender, which were then used to fund the improper payment of commission fees to
253    Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

254    *AGENT PRACTICED UP-SELLING*

255    By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.   In so
256    doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
257    that Agent was licensed by the state.   Agent further defrauded Petitioner by failing to disclose
258    Agent's conspiratorial relationship to Lender,   Agent violated Agent's fiduciary duty to
259    Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
260    connivances, wherein Agent proactively made knowingly false and misleading statements of
261    alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
262    Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
263    a loan product offered by the Lender.   Said loan product was more expensive than Petitioner

264  could legally afford. Agent acted with full knowledge that Petitioner would have made a
265  different decision had Agent given complete disclosure.

266  ### *FRAUDULENT INDUCEMENT*

267  Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
268  known, Petitioner could not afford in order to unjustly enrich Lender.

269  ### *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

270  Said more expensive loan product was calculated to produce a higher return when sold as a
271  security to an investor who was already waiting to purchase the loan as soon as it could be
272  consummated.

#### Extra Commission for Late Payments

273

274  Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
275  that Lender intended Petitioner would have difficulty paying.  The industry standard payment to
276  the servicer for servicing a mortgage note is 3% of the amount collected.  However, if the
277  borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
278  Thereby, the Lender stands to receive more than double the regular commission on collections if
279  the borrower pays late.

#### Extra Income for Handling Foreclosure

280

281  Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
282  on which Lender intended petitioner to default.  In case of default, the Lender, acting as servicer,
283  receives considerable funds for handling and executing the foreclosure process.

#### Credit Default Swap Gambling

284

285  Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
286  default swap, commonly referred to as a derivative as addressed more fully below.  Since Lender
287  designed the loan to fail, betting on said failure is essentially a sure thing.

288  ### *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

289  Lender sold the security instrument after closing and received consideration in an amount in
290  excess of the lien held by Lender.  Since Lender retained the lien document upon the sale of the

291   security instrument, Lender separated the lien from said security instrument, creating a fatal and
292   irreparable flaw.

293   When Lender received consideration while still holding the lien and said consideration was in
294   excess of the amount of the lien, Lender was in a position such that he could not be harmed and
295   could not gain standing to enforce the lien.  The lien was, thereby, rendered void.

296   Since the separation of the lien from the security instrument creates such a considerable concern,
297   said separation certainly begs a question: "Why would the Lender retain the lien when selling the
298   security instrument?"

299   When you follow the money the answer is clear.  The Lender will hold the lien for three years,
300   then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
301   the full amount from Lender's tax liability, thereby, receiving consideration a second time.

302   Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
303   lien to the holder of the security, however, the lien once satisfied, does not gain authority just
304   because the holder, after receiving consideration, decides to transfer it to someone else.

305   ### *LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES*

306   Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
307   information that Lender had as a result of creating the faulty loans sure to default.  Lender was
308   then free to invest on the bet that said loan would default and stood to receive unjust enrichment
309   a third time.  This credit default swap derivative market scheme is almost totally responsible for
310   the stock market disaster we now experience as it was responsible for the stock market crash in
311   1907.

312   ### *LENDER CHARGED FALSE FEES*

313   Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
314   Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
315   vendor.

316   Lender charged other fees that were a normal part of doing business and should have been
317   included in the finance charge.

ORIGINAL PETITION

318   Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time
319   did Lender or Trustee provide documentation to show that the fees herein listed were valid,
320   necessary, reasonable, and proper to charge Petitioner.

| 803 | Appraisal | $300.00 |
|------|-----------|---------|
| 804 | Credit Report | $12.00 |
| 808 | Tax Service Fee | $73.00 |
| 809 | Doc Prep Fee | $325.00 |
| 810 | Underwriting Fee | $325.00 |
| 811 | Flood Determination Fee | $7.00 |
| 812 | Life of Loan Flood Cert | $5.00 |
| 901 | Interest from 1/8/07 to 2/1/07 @ $36.513/day | $876.33 |
| 903 | Hazard Insurance Premium | $397.44 |
| 1001 | Hazard Insurance | $99.36 |
| 1004 | County Property Taxes | $16.67 |
| 1101 | Settlement fee | $329.00 |
| 1104 | Title Endorsement | $50.00 |
| 1105 | Wire Fee | $20.00 |
| 1106 | eDocFee | $25.00 |
| 1107 | Courier Fee | $22.50 |
| 1109 | Lenders Coverage | $533.00 |
| 1111 | Recording Service Charge | $48.00 |

321   Debtor is unable to determine whether or not the above fees are valid in accordance with the
322   restrictions provided by the various consumer protection laws.  Therefore, please provide; a
323   complete billing from each vendor who provided the above listed services; the complete contact
324   information for each vendor who provided a billed service; clearly stipulate as to the specific
325   service performed; a showing that said service was necessary; a showing that the cost of said
326   service is reasonable; a showing of why said service is not a regular cost of doing business that
327   should rightly be included in the finance charge.

328   The above charges are hereby disputed and deemed unreasonable until such time as said charges
329   have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
330   restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

331   In the event lender fails to properly document the above charges, borrower will consider same as
332   false charges.  The effect of the above amounts that borrower would pay over the life of the note
333   will be an overpayment of $173,903.88  This amount will be reduced by the amount of items
334   above when said items are fully documented.

335   ***RESPA PENALTY***

336   From a cursory examination of the records, with the few available, the apparent RESPA
337   violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In

338   Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
339   presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
340   No 1st Payment Letter.

341   The closing documents included no signed and dated :  Financial Privacy Act Disclosure; Equal
342   Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
343   statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
344   disclosure letter; loan discount fee disclosure; business insurance company arrangement
345   disclosure; notice of right to rescind.

346   The courts have held that the borrower does not have to show harm to claim a violation of the
347   Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance.  And,
348   in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
349   no more than two thousand, considering the large number enumerated here, it is reasonable to
350   consider that the court will assess the maximum amount for each violation.

351   Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
352   the note, borrower has calculated that, the number of violations found in a cursory examination
353   of the note, if deducted from the principal, would result in an overpayment on the part of the
354   borrower, over the life of the note, of $307,809.78.

355   If the violation penalty amounts for each of the unsupported fees listed above are included, the
356   amount by which the borrower would be defrauded is $272,107.46

357   Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
358   variance, it appears that lender intended to defraud borrower in the amount of $924,546.81

359   ### *LENDER CONSPIRED WITH APPRAISER*

360   Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
361   purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
362   duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
363   inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
364   Petitioner.

ORIGINAL PETITION

365     ***LENDER CONSPIRED WITH TRUSTEE***

366     Lender conspired with the trust Agent at closing to create a condition of stress for the specific
367     purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
368     fully understand what was being signed.

369     The above referenced closing procedure was a carefully crafted connivance, designed and
370     intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
371     to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
372     did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
373     as required by various consumer protection statutes.

374     ***DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES***

375     In the manner in which Defendants have carried on their business enterprises, they have engaged
376     in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
377     (Deceptive Practices Act).

378     Such conduct comprises a pattern of business activity within the meaning of such statutes, and
379     has directly and proximately caused Petitioner to suffer economic and non-economic harm and
380     detriment in an amount to be shown according to proof at trial of this matter.

381     ***EQUITABLE TOLLING FOR TILA AND RESPA***

382     The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
383     Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

384     Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
385     *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
386     are subject to a one-year limitations period; however, such claims are subject to the equitable
387     tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
388     subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
389     that given the remedial purpose of TILA, the limitations period should run from the date of
390     consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
391     circumstances, suspend the limitations period until the borrower discovers or has reasonable
392     opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
393     *v. California, 784 F.2d 910, 915 9t*h Cir. 1986).

ORIGINAL PETITION                                                    14 of 24

394    Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614*, the
395    anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
396    that such limitations period may be equitably tolled. The Court of Appeals for the District of
397    Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*
398    *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
399    opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
400    *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
401    that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
402    *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
403    *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
404    interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
405    language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
406    of precedential value, this Court has previously found both the TILA and **RESPA** limitations
407    periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
408    *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

409    The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
410    by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
411    existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
412    *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
413    Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
414    any wrongful conduct by the Defendants. Santa Maria. at 1178.

415    ***BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING***
416    ***STANDARDS***

417    Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
418    assets by, for example, providing W-2 statements, tax returns, bank statements, documents
419    evidencing title, employment information, and other information and documentation that could
420    be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
421    ability to repay a particular loan over both the short and long term. Defendants deviated from and
422    disregarded these standards, particularly with regard to its riskier and more profitable loan
423    products.

424    **Low-Documentation/No-Documentation Loans.**

ORIGINAL PETITION

425  Driven by its desire for market share and a perceived need to maintain competitiveness with the
426  likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
427  documentation loan products, including the HARMs and HELOCs described hereinabove, and
428  began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
429  the already eased underwriting standards to the point of disregarding such standards. This
430  quickened the loan origination process, allowing for the generation of more and more loans
431  which could then be resold and/or securitized in the secondary market.

432  Defendants marketed no-documentation/low-documentation loan programs that included
433  HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
434  income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
435  confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
436  was to be roughly consistent with incomes in the types of jobs in which the borrower was
437  employed. When borrowers were requested to document their income, they were able to do so
438  through information that was less reliable than in a full-documentation loan.

439  For stated income loans, it became standard practice for loan processors, loan officers and
440  underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
441  income loans, emphasizing loan origination from a profitability standpoint at the expense of
442  determining the ability of the borrower to repay the loan from an underwriting standpoint,
443  encouraged the overstating and/or fabrication of income.

444      **Easing of Underwriting Standards**

445  In order to produce more loans that could be resold in the secondary mortgage market,
446  Defendants also relaxed, and often disregarded, traditional underwriting standards used to
447  separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
448  the base FICO score needed for a SISA loan.

449  Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
450  used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
451  loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
452  income ratios (the amount of monthly income compared to monthly debt service payments and
453  other monthly payment obligations.

ORIGINAL PETITION

454   With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
455   term financial circumstances, approving the loan based on the initial fixed rate without taking
456   into account whether the borrower could afford the substantially higher payment that would
457   inevitably be required during the remaining term of the loan.

458   With respect to HELOCs, Defendants underwrote and approved such loans based only on the
459   borrower's ability to afford the interest-only payment during the initial draw period of the loan,
460   rather than on the borrower's ability to afford the subsequent, fully amortized principal and
461   interest payments.

462   As Defendants pushed to expand market share, they eased other basic underwriting standards.
463   For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
464   allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
465   eased underwriting standards the Defendants also were encouraging consumers to go further into
466   debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed
467   underwriting standards created the aftermarket supply they needed. As a result, the Defendants
468   made it easy for the unwary consumer to take on more debt than he could afford by encouraging
469   unsound financial practices, all the while knowing defaults would occur more and more
470   frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
471   standards.

472   Defendants knew, or in the exercise of reasonable care should have known, from its own
473   underwriting guidelines industry standards that it was accumulating and selling/reselling risky
474   loans that were likely to end up in default. However, as the pressure mounted to increase market
475   share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
476   underwriting guidelines. Such was the environment that loan officers and underwriters were,
477   from time to time, placed in the position of having to justify why they did not approve a loan that
478   failed to meet underwriting criteria.

479   **Risk Layering**

480   Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
481   loans with one or more relaxed underwriting standards.

482   Defendants knew, or in the exercise of reasonable care should have known, that layered risk
483   would increase the likelihood of default. Among the risk layering Defendants engaged in were

ORIGINAL PETITION                                                      17 of 24

484   approving HARM loans with little to no down payment, little to no documentation, and high
485   DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
486   the loans it promoted to borrowers.

487   Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
488   mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
489   believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
490   business ignored basic established underwriting standards and acted to mislead the borrower, all
491   to the detriment of the borrower and the consumer of loan products..

492   Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
493   engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
494   business practices described above in paragraphs 30-42 of this Complaint

495   ***UNJUST ENRICHMENT***

496   Petitioner is informed and believes that each and all of the Defendants received a benefit at
497   Petitioner's expense, including but not limited to the following: To the Agent, commissions,
498   yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
499   be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
500   surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
501   resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
502   percentages of payment proceeds, charges, and other "back end" payments in amounts to be
503   proved at trial; To all participants, the expectation of future revenues from charges, penalties and
504   fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

505   By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
506   and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
507   deprived, and is entitled to restitution in the amount of $924,546.81

508   ***CLAIM TO QUIET TITLE.***

509   Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
510   the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
511   interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
512   and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

ORIGINAL PETITION                                                                    18 of 24

513   Defendants have no title, estate, lien, or interest in the Subject Property in that the purported

514   power of sale contained in the Deed of Trust is of no force or effect because Defendants' security

515   interest in the Subject Property has been rendered void and that the Defendants are not the holder

516   in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'

517   involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

518       "a Petitioner is entitled to damages from those Defendants who concur in the tortuous

519       scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*

520       *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*

521       *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*

522       *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*

523       *Rptr. 2d 752 (2d Dist. 1995).*

524   ***SUFFICIENCY OF PLEADING***

525   Petitioner has sufficiently pled that relief can be granted on each and every one of the

526   Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond

527   doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would

528   entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All

529   allegations of material fact in the complaint are taken as true and construed in the light most

530   favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

531   Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.

532   8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal

533   theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*

534   *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal

535   conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court

536   should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,

537   Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of

538   their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,

539   relief as requested herein should be granted.

ORIGINAL PETITION

540                          **CAUSES OF ACTION**

541      ***BREACH OF FIDUCIARY DUTY***

542      Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
543      duty of care with respect to the mortgage loan transactions and related title activities involving
544      the Trust Property.

545      Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
546      breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
547      all applicable laws governing the loan transactions in which they were involved, including but
548      not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

549      Defendant's breaches of said duties were a direct and proximate cause of economic and non-
550      economic harm and detriment to Petitioner(s).

551      Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
552      all to be shown according to proof at trial of this matter.

553      ***CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE***

554      Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
555      duty to properly perform due diligence as to the loans and related transactional issues described
556      hereinabove.

557      In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
558      X and Z promulgated there under to, among other things, provide proper disclosures concerning
559      the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
560      or should have known that borrowers could not afford or maintain, and to avoid paying undue
561      compensation such as "yield spread premiums" to mortgage Agents and loan officers.

562      Defendants knew or in the exercise of reasonable care should have known, that the loan
563      transactions involving Petitioner and other persons similarly situated were defective, unlawful,
564      violative of federal and state laws and regulations, and would subject Petitioner to economic and
565      non-economic harm and other detriment.

566      Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
567      Z promulgated there under were intended and designed to protect, and the conduct alleged

ORIGINAL PETITION                                                        20 of 24

568    against Defendants is the type of conduct and harm which the referenced statutes and regulations
569    were designed to deter.

570    As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
571    non-economic harm in an amount to be shown according to proof at trial.

572    ***AGENT: COMMON LAW FRAUD***

573    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
574    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
575    ground for believing them to be true.

576    Agents made these representations with the intention of inducing Petitioner to act in reliance on
577    these representations in the manner hereafter alleged, or with the expectation that Petitioner
578    would so act.

579    Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
580    in their negligent misrepresentation, and that various Agents were negligent in not implementing
581    procedures such as underwriting standards oversight that would have prevented various Agents
582    from facilitating the irresponsible and wrongful misrepresentations of various Agents to
583    Defendants.

584    Petitioner is informed and believes that Agent acted in concert and collusion with others named
585    herein in promulgating false representations to cause Petitioner to enter into the LOAN without
586    knowledge or understanding of the terms thereof.

587    As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
588    Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
589    opportunities, attorney fees and costs, and other damages to be determined at trial. As a
590    proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
591    suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
592    mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
593    at trial.

ORIGINAL PETITION

594   *PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED*
595   *COVENANT OF GOOD FAITH AND FAIR DEALING.*

596   Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
597   fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
598   performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
599   *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
600   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
601   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

602   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
603   particular significance, in part because of the special relationship between the insurer and the
604   insured. The insurer, when determining whether to settle a claim, must give at least as much
605   consideration to the welfare of its insured as it gives to its own interests. . . The standard is
606   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

607   Likewise, there is a special relationship between an Agent and borrower. "A person who
608   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
609   otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
610   consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
611   be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
612   *good faith. If the Agent knew or should have known that the Borrower will or has a likelihood of*
613   *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
614   (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
615   [*Emphasis Added*].

616   All Defendants, willfully breached their implied covenant of good faith and fair dealing with
617   Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
618   provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
619   product without regard for other more affordable products; (4) Placed Petitioner into a loan
620   without following proper underwriting standards; (5) Failed to disclose to Petitioner that
621   Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
622   valid and /or properly documented substitutions and assignments so that Petitioner could
623   ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
624   request for documentation of the servicing of Petitioner's loan and the existence and content of

625   relevant documents. Additionally, Defendants breached their implied covenant of good faith and
626   fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
627   right under an alleged power of sale because the purported assignment was not recorded and by
628   willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
629   special relationship inherent in a real estate transaction between Agent and borrower, *and* all
630   Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

631   ### *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*
632   *SEQ*

633   Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
634   contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
635   Action as though the same were set forth herein.

636   Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
637   the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
638   Property, and entitles Petitioner to damages as proven at trial.

639   ### *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

640   The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
641   highly leveraged and vulnerable consumers who placed their faith and trust in the superior
642   knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
643   civilized society.

644   Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
645   distress, or acted in conscious and/or reckless disregard of the probability that such distress
646   would occur.

647   Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
648   conduct of Defendants as described hereinabove.

649   As a result of such severe emotional distress, Petitioner suffered economic and non economic
650   harm and detriment, all to be shown according to proof at trial of this matter.

651   Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
652   Petitioner and secure to Petitioner quite title;

ORIGINAL PETITION

653 Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
654 as payments to Defendants based on the fraudulently secured promissory note in an amount to be
655 calculated by Defendants and verified to Petitioner;

656 Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
657 amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
658 equal to $2,773,640.43

659                                    **PRAYER**
660 WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,
661 as follows:

662     For an emergency restraining order enjoining lender and any successor in interest from
663     foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth
664     herein;

665     For a permanent injunction enjoining Defendants from engaging in the fraudulent,
666     deceptive, predatory and negligent acts and practices alleged herein;

667     For quiet title to Property;

668     For rescission of the loan contract and restitution by Defendants to Petitioner according
669     to proof at trial;

670     For disgorgement of all amounts wrongfully acquired by Defendants according to proof
671     at trial;

672     For actual monetary damages in the amount $924,546.81;

673     For pain and suffering due to extreme mental anguish in an amount to be determined at
674     trial.

675     For pre-judgment and post-judgment interest according to proof at trial;

676     For punitive damages according to proof at trial in an amount equal to $2,773,640.43.

677     For attorney's fees and costs as provided by statute; and,

678     For such other relief as the Court deems just and proper.

679 **Respectfully Submitted,**
680
681 *Michael Sparlin*        *Sharon Sparlin*
682 **Michael B Sparlin**       **Sharon J Sparlin**

ORIGINAL PETITION               24 of 24